******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COPPOLA CONSTRUCTION COMPANY, INC.
*v.* HOFFMAN ENTERPRISES LIMITED
PARTNERSHIP ET AL.
(AC 35503)

DiPentima, C. J., and Prescott and Pellegrino, Js.

*Argued October 8, 2014—officially released May 12, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Sheldon, J.)

*Lawrence G. Rosenthal*, with whom, on the brief, was
*Matthew T. Wax-Krell*, for the appellant-appellee
(plaintiff).

*Richard P. Weinstein*, for the appellee-appellant
(named defendant).

*Opinion*

PRESCOTT, J. This appeal and cross appeal arise out of a dispute over payment for construction work that the plaintiff, Coppola Construction Company, Inc., performed while acting as the general contractor for a project to build a new car storage facility on property in Simsbury owned by the defendant Hoffman Enterprises Limited Partnership.[1] After a lengthy bench trial, the court rendered judgment in favor of the plaintiff on counts one and three of the operative complaint, which sounded, respectively, in breach of contract and unjust enrichment, and in favor of the defendant on the remaining counts sounding in quantum meruit, tortious interference with a contractual relationship, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The court also rendered judgment in favor of the defendant on four counts of its six count counterclaim, alleging a breach of the implied covenant of good faith and fair dealing, a violation of CUTPA and setoffs for payments made to certain of the plaintiff's subcontractors that were not credited. The court found in favor of the plaintiff on the remaining counts of the counterclaim.

The plaintiff appeals and the defendant cross appeals from the judgment. In particular, the plaintiff claims that the court improperly (1) determined that there was a "de facto" termination of the parties' construction contract, which led the court to apply an incorrect measure of damages, (2) determined that the defendant was entitled to a setoff based on partial payments it had made to the plaintiff with respect to certain paving work, (3) failed to hold the defendant contractually liable for extra work performed by the plaintiff that was authorized by the defendant's construction manager, (4) found that the plaintiff's attorney had issued an ultimatum to the defendant that the plaintiff would not return to work on the project until the defendant had paid all outstanding invoices for work already completed, (5) failed to hold the defendant liable for tortious interference with the plaintiff's contractual relationships with its subcontractors, and (6) found in favor of the defendant on the counts of its counterclaim by concluding that the plaintiff had engaged in an abuse of process when it filed an excessive mechanic's lien on the Simsbury property.

By way of cross appeal, the defendant claims that the court improperly (1) held it liable for work that the plaintiff performed pursuant to certain change orders despite the fact that the plaintiff had failed to provide the defendant's construction manager with sufficient documentation to establish the fair and reasonable value of such work, and (2) rejected those counts of the defendant's counterclaim seeking to recover expenses that the defendant incurred in defending against mechanic's liens that the plaintiff's subcontractors had

filed against the defendant's property.[2]

We agree with the plaintiff that the court improperly determined that the defendant had terminated rather than breached the parties' contract, and that the court employed, in part, an incorrect measure of damages. We reject the remainder of the parties' claims. Thus, we reverse the judgment of the court only with respect to its award of damages on count one of the complaint and remand the case to the trial court with direction to hold a new hearing in damages consistent with this opinion. The judgment otherwise is affirmed.

The following facts, as set forth by the court in its memorandum of decision, and procedural history are relevant to our resolution of the parties' claims. Signature Construction Services International, LLC (Signature), was, at all relevant times, a limited liability company owned by Robert L. Saunders. Saunders was hired by the defendant to secure a general contractor to complete a construction project on land that the defendant owned in Simsbury. The project was part of a larger, multimillion dollar expansion and modernization effort being undertaken by the defendant for Hoffman Auto Group. Hoffman Auto Group was in the process of adding a new Nissan dealership at the Simsbury site to its existing Honda and Toyota dealerships. In addition, the date for the renewal of Hoffman Auto Group's franchise agreement with Toyota was fast approaching, and Toyota was insisting that Hoffman Auto Group allocate 450 new spaces for Toyota inventory. The project primarily involved site preparation and construction of two large, paved parking lots needed to house additional new car inventory.

Before the larger of the two proposed parking lots (upper lot) could be completed, a portion of an existing hillside on the Simsbury property needed to be excavated. In addition to that excavation work, the unexcavated portion of the hillside needed to be shored up to prevent erosion and to protect against flooding, washouts or collapse. The defendant hired an engineering firm, Milone & MacBroom, which prepared construction plans and specifications for the project (plans). The plans provided for, among other things, the building of swales, drainage channels, a retaining wall around the upper lot, the installation of a drainage system within and below the lots, and the construction of a large retention pond to hold runoff.

The defendant had informed Saunders that it sought to complete the entire project for no more than $600,000. In mid-2008, Saunders sought and received bids from two contractors, each of whom informed Saunders that the project as proposed could not be completed for less than $1 million. They submitted written bids of $1.2 and $1.1 million.

On the basis of a referral by a mutual acquaintance,

Saunders also approached the plaintiff about the project. The plaintiff submitted a handwritten proposal of $1.937 million. Saunders informed the plaintiff that its bid was much too high and that the plaintiff would need to do some " 'value engineering' " if it wanted to be considered seriously for the contract. The plaintiff submitted a new bid of $1.796 million, which Saunders also rejected. At no time during the bidding process did Saunders inform the plaintiff of the defendant's desire to complete the entire project for no more than $600,000.

Fearing that he would be unable to secure a general contractor to complete the project at a price that would be amenable to the defendant, or that the project might not get completed before the construction season ended in late fall, Saunders devised a new strategy. Specifically, Saunders planned to hire a contractor who would consent to starting a portion of the total work needed to complete the project at a price that would meet the approval of the defendant and, thereafter, as the initially agreed upon work progressed, would agree to take on the remainder of the work pursuant to change orders.

The plaintiff agreed to Saunders' approach, and, in June, 2009, entered into a written contract with Signature as the disclosed agent for the defendant.[3] Pursuant to sections one and two of the contract, the plaintiff agreed to act as the general contractor and to provide all labor and materials necessary for the completion of all work provided for in the existing plans as modified by exhibits A and B, which were attached to the contract and incorporated by reference. Section three of the contract required the plaintiff to commence work on or before July 6, 2009, and to substantially complete the work in eight weeks from the start date. In exchange for the plaintiff's performance, Signature, in its designated role as the construction manager, was to pay the plaintiff $400,000 in specified progress payments.[4]

Exhibit A contained a list of the work that the plaintiff agreed to perform under the contract, including some work that was not a part of the existing plans.[5] Exhibit B, on the other hand, expressly removed from the scope of the work certain items that were included in the plans in order "to lower the price to that set forth in the [contract]."[6]

Section five of the contract governed how the parties intended to handle anticipated future changes to the scope of work as set forth in the original contract. Pursuant to section five, Signature, in its role as construction manager, had the authority to make any additions and deletions to the work covered by the contract, either unilaterally or by agreement, provided that any such changes were to be in writing.[7] Adjustments to the original $400,000 contract price as a result of any change orders were to be determined by "mutual acceptance of a lump sum properly itemized and supported

by sufficient data to permit valuation by [the] [c]onstruction [m]anager." In the event that the parties could not reach an agreement as to a lump sum amount, the contract provided that "the [c]ontractor will perform [the] work and be paid on a time and material cost basis. A fee of 20 [percent] will be added to the costs for [c]ontractor overhead and profit."

After the project was under way, Saunders, on behalf of Signature, signed and issued a total of six written change orders authorizing additional work needed to complete the project. The first such change order, dated July 7, 2009, called for the installation of certain fixtures into the drainage system under the new lots for a lump sum price of $56,500. The second change order, dated July 29, 2009, provided for the removal and replanting of thirteen trees for a lump sum price of $1950. A third substitute change order, issued on August 20, 2009, authorized the plaintiff to build 13,274 square feet of retaining walls at a price of $21.50 per square foot for a total of $285,391, which was to be payable in four installments. The fourth change order was signed by Saunders on August 28, 2009, and provided for the delivery and installation of 6187.5 tons of one and one-quarter inch process stone to be used as the base of the parking lots at a price of $18.20 per ton or $144,436.78.[8] On or about September 11, 2009, Saunders issued a fifth change order that authorized the mining and excavating of an unspecified amount of gravel, as well as the trucking, placement and compaction testing of that gravel, for use as backfill behind the new retaining walls.[9] The parties agreed to a lump sum price of $21.78 per cubic yard. That same day, Saunders issued a sixth change order that authorized the fine grading of the process stone base for the two lots as well as paving, curbing, and striping for parking spaces for a lump sum total of $189,000. That work was to be paid for in three installments totaling $189,000: an initial $80,000 deposit, $70,000 when the upper lot was completed and $39,000 upon completion of the lower lot.

The plaintiff also performed other extra work on the project that, although approved by Signature on behalf of the defendant, was never the subject of a written change order setting forth a lump sum payment or lump sum unit price.[10] This additional extra work included: "(1) the hammering of ledge encountered during excavation; (2) the furnishing and installation of clean or washed stone as backfill behind the new retaining walls; (3) the hiring of IMTL, an inspection company that [Jeffrey S. Hoffman] personally ordered the plaintiff to bring on the site and take orders from as to backfilling of the retaining walls in order to ensure that the job was done correctly so that the walls would not collapse; (4) extensive work in dewatering the job site; and (5) the provision of certain labor and equipment on an overtime basis during certain particularly intense weeks of extra work on the project."

In performing its obligations on the project, the plaintiff used a number of subcontractors and suppliers. The plaintiff's primary subcontractor, however, was Massey Brothers Excavating, LLC (Massey Brothers), which performed work on the project starting in late June, 2009, at a rate of $23,000 per week. The court stated in its memorandum of decision: "[T]he parties developed a procedure for verifying and authorizing the performance of extra work in order to distinguish it, for payment purposes, from work performed under the original contract. Under that procedure, daily work slips describing extra work performed by Massey Brothers would be submitted . . . to Signature's on-site supervisor . . . who would sign each slip to verify that the work described therein had been performed as indicated after confirming with [Saunders] that it had, in fact, been approved for performance as extra work. . . . [E]ach such work slip was made out in triplicate, with one copy given to the plaintiff, one copy given to [Saunders] for transmission to [Ann Marie Shackway] of the Hoffman Auto Group, and one copy retained by Massey Brothers for its own records."

The work slips also were used to authorize and verify the performance of the additional extra work for which there was no written change order, agreed upon lump sum total price, or lump sum unit price. The court stated: "Although [Shackway] was aware that extra work had been performed on the project and that work slips documenting such work had been prepared by Massey Brothers, signed by [the on-site supervisor] and submitted to [Saunders] for reconciliation . . . she never received the set given to [Saunders] for her review." Saunders also never performed any reconciliation of Massey Brothers' work slips to verify the plaintiff's claims for payment for extra work not covered by change orders, and he never presented any invoices for payment to Hoffman in order to avoid what he predicted would be Hoffman's angry reaction over the growing costs of the project.

By mid-September, 2009, the plaintiff had finished the majority of the work that it had agreed to perform under the original contract. The only work not completed was the screening and installation of the purportedly existing gravel bank, for which the plaintiff was to have received an installment payment of $35,000, and approximately one half of the general cleanup and the final inspection, for which the plaintiff was to have received a total of $15,000 under the contract. The screening/installation work was not completed because, as previously noted, no on-site gravel bank existed, and the remainder of the cleanup work and the final inspection could not be performed until all other work on the project was completed. In response to the plaintiff's requests for payments for work performed pursuant to the original contract, the plaintiff

received checks totaling $357,500, which accounted for all but $42,500 of the original $400,000 contract price.

By mid-November, 2009, the plaintiff also had completed most of the extra work it was required to perform under the six written change orders, as well as significant additional extra work not covered by a written change order. More specifically, the plaintiff had completed and been paid in full for work covered by the first and second change orders. All work on the new retaining walls covered by the third change order also was completed, although the plaintiff had received only two of the four installment payments totaling $215,000 of the $285,391 agreed upon lump sum total for that work. All work pursuant to the fourth and fifth change orders was also completed, but the plaintiff had received no payments for that work. The paving work under the sixth change order was completed only as to the upper lot, for which the plaintiff had received the first two installment payments totaling $150,000. The paving work to complete the lower lot, the completion of which would have entitled the plaintiff to receive the final installment of $39,000, remained unfinished. With respect to the additional extra work that Signature had authorized but never included in a written change order, Saunders never submitted any of the plaintiff's invoices for such work to the defendant as it was completed, and, thus, the plaintiff had not been paid for that work.

In total, by mid-November, the defendant had paid the plaintiff $357,500 for work completed under the original $400,000 contract and an additional $423,450 for extra work performed pursuant to written change orders, for a total of $780,950. Of that total, the plaintiff had paid out to its subcontractors $479,510.38, but still owed them an additional $455,500 for completed work, including $293,000 to Massey Brothers alone.

The plaintiff made several unsuccessful attempts to contact Shackway to learn when it could expect to be paid for the balance due for work already completed. Meanwhile, the subcontractors and suppliers became angry with the plaintiff because of its failure to pay them in full for their work despite repeated demands for payment, including demands for interest on past due accounts. Massey Brothers' on-site supervisor, David Massey, also complained directly to Hoffman about the plaintiff's failure to pay subcontractors. Eventually, many of the subcontractors, including Massey Brothers, filed mechanic's liens against the defendant's property.

On November 17, 2009, the plaintiff had its attorney call Hoffman directly to complain about the defendant's failure to pay the plaintiff in full for completed work. The plaintiff's attorney informed Hoffman that all ongoing work on the project was suspended, and would remain so, until the plaintiff received payment for the work it already had completed. An itemized list of all

invoices that the plaintiff claimed to be outstanding was also faxed to Hoffman. According to that fax, the outstanding charges totaled $1,332,954.31. Hoffman was very surprised by the amount demanded because, as a result of Saunders' failure to forward work slips and other documentation to the defendant, Hoffman had not seen any documents suggesting that such charges were outstanding.

Hoffman had the defendant's attorney convene a meeting the next day, November 18, 2009, with Massey to determine how much the plaintiff currently owed to Massey Brothers for work already performed on the project and to discover if Massey Brothers might cooperate with the defendant to complete the project without further involvement of the plaintiff. Neither Saunders nor the plaintiff were invited to or attended that meeting. Following the meeting, the defendant hired Massey Brothers to complete all unfinished site work and to recruit a paving company to finish the lower lot. The defendant paid Massey Brothers a total of $50,000 for its work completing the project by checks dated November 18 and November 19, 2009. The defendant later paid the paving company hired by Massey Brothers two installments totaling $66,000. The plaintiff performed no further work on the project after its attorney contacted the defendant on November 17, 2009.

On December 4, 2009, the plaintiff filed a mechanic's lien on the defendant's property in the amount of $1.4 million.[11] On December 9, 2009, the plaintiff filed an application for a prejudgment remedy of attachment in the amount of $1.5 million, and, shortly thereafter, commenced the underlying civil action. The parties later agreed to an expedited trial date in lieu of a prejudgment remedy hearing. In the operative third amended complaint, the plaintiff alleged causes of action against the defendant sounding in breach of contract, quantum meruit, unjust enrichment, tortious interference and violation of CUTPA. See footnote 1 of this opinion. The defendant filed a counterclaim alleging breach of the implied covenant of good faith and fair dealing, fraud, aiding and abetting a breach of fiduciary duty, and a CUTPA violation.[12] The matter was tried to the court, *Sheldon, J.*, over numerous days beginning on November 16, 2010, and ending on September 28, 2011.[13]

On August 16, 2012, the court issued a lengthy memorandum of decision disposing of all claims. The court concluded that, with respect to unpaid work that the plaintiff had performed on the project, it was entitled to recover from the defendant $534,157.54 in compensatory damages in count one and an additional $28,556.40 for unjust enrichment. The court declined to award the plaintiff interest pursuant to General Statutes § 37-3a. The court further rejected the plaintiff's claims of tortious interference with contractual relationships and violation of CUTPA, each of which was premised on

the defendant's having hired Massey to complete the project in place of the plaintiff.

With respect to the defendant's counterclaim, the court agreed with the defendant that the plaintiff intentionally had overcharged it for some of the work performed, but concluded that such overcharging was not a basis for ruling in favor of the defendant on those counts of its counterclaim alleging fraud, aiding and abetting a breach of fiduciary duty, breach of the covenant of good faith and fair dealing, or a violation of CUTPA. Nevertheless, the court was persuaded by the defendant's argument that the plaintiff had engaged in an abuse of process by filing an excessive mechanic's lien in this matter, and the court concluded that the abuse of process provided an independent basis for ruling in favor of the defendant on those counts of its counterclaim alleging a breach of the covenant of good faith and fair dealing and a violation of CUTPA. The court indicated that it would award damages for costs and attorney's fees in defending against the excessive mechanic's lien, and costs and expenses expended in prosecuting the CUTPA counterclaim, with the amounts to be determined at a later hearing. Finally, the court determined that the defendant was entitled to a total of $344,544.20 in setoffs against the damages awarded to the plaintiff because the defendant had paid directly to the plaintiff's subcontractors sums owed to them by the plaintiff.

On December 4, 2012, the court issued a memorandum of decision denying a motion for reargument filed by the plaintiff. On February 21, 2013, following a hearing, the court issued a supplemental memorandum of decision awarding the defendant a combined $40,590.64 in damages on the successful counts of its counterclaim and an additional $78,653.52 in attorney's fees for the CUTPA violation. Subtracting the defendant's total award of damages and setoffs from the damages awarded to the plaintiff, the defendant was left owing the plaintiff a total of $98,925.58. This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

We first turn to those claims on appeal related to the court's resolution of the plaintiff's breach of contract count and those counts that, in the alternative, sought restitution. Specifically, the plaintiff claims that the court improperly (1) determined that there was a "de facto" termination for convenience of the parties' contract and used that determination as a basis for awarding an incorrect measure of damages; (2) determined that the defendant was entitled to a setoff for overpaying the plaintiff with respect to paving work covered by the sixth written change order; (3) failed to hold the defendant liable for extra work at prices that, although not incorporated in a formal written change order, were

nevertheless orally authorized by Saunders in his capacity as the defendant's agent; and (4) made an erroneous finding that the plaintiff had issued an ultimatum to the defendant, refusing to return to work until all outstanding invoices had been paid in full. In addition to the claims raised by the plaintiff, the defendant claims in its cross appeal that the court improperly held the defendant liable for work covered by certain written change orders, despite the fact that there was insufficient documentation that established the fair and reasonable value of that work. We address each of these claims in turn after first setting forth our standard of review as well as some generally applicable principles of law.

It is axiomatic that "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. [If], however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *United Technologies Corp.* v. *Groppo*, 238 Conn. 761, 767, 680 A.2d 1297 (1996).

"In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Citation omitted; internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004).

"[I]n private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability. . . . [C]ourts do not unmake bargains unwisely made. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Schwartz* v. *Family Dental Group, P.C.*, 106 Conn. App. 765, 772–73, 943 A.2d 1122, cert. denied, 288 Conn. 911, 954 A.2d 184 (2008). "In construing an unambiguous contract, the controlling factor is the intent expressed in the contract, not the intent which the parties may have had or which the court believes they ought to have had. . . . [If] . . . there is clear and definitive contract language, the scope and meaning of that language

is not a question of fact but a question of law." (Citation omitted; internal quotation marks omitted.) *Antonino* v. *Johnson*, 113 Conn. App. 72, 75, 966 A.2d 261 (2009).

The required elements necessary to sustain an action for breach of contract are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Chiulli* v. *Zola*, 97 Conn. App. 699, 706–707, 905 A.2d 1236 (2006). "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence." (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 534, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999).

Substantial performance by a builder or contractor ordinarily is a constructive condition of the property owner's duty to pay, and, therefore, if there is an *unexcused* failure by the builder or contractor to render substantial performance, the builder or contractor cannot maintain an action on the contract for any unpaid balance of the contract price. *Argentinis* v. *Gould*, 219 Conn. 151, 157, 592 A.2d 378 (1991); see also 2 Restatement (Second), Contracts § 237, comment (d) (1981) (without substantial performance, building contractor cannot recover unpaid balance of contract, but may have claim for restitution).[14] "Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." (Internal quotation marks omitted.) *Mastroianni* v. *Fairfield County Paving, LLC*, 106 Conn. App. 330, 340–41, 942 A.2d 418 (2008). "[T]he general rule is that a contractor who substantially performs under a building or construction contract is entitled to recover the contract price minus the cost of repairing the defects or completing the unfinished part of the work so as to bring the construction up to the level required by the contract . . . ." (Footnote omitted.) 24 R. Lord, Williston on Contracts (4th Ed. 2002) § 66:14, pp. 448–51. "[W]hether a building contract has been substantially performed is ordinarily a question of fact for the trier to determine." (Internal quotation marks omitted.) *Clem Martone Construction, LLC* v. *DePino*, 145 Conn. App. 316, 339, 77 A.3d 760, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013).

A contractor may be excused from its duty of substantial performance, however, and, thus, may file an action based upon the contract, if the owner repudiates the contract or breaches it outright. "A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of its obligation under the contract. It may be by words *or other conduct*." (Emphasis added; footnote omitted.) 2 E. Farn-

sworth, Contracts (3d Ed. 2004) § 8.21, p. 558. "[A]n anticipatory breach discharges any remaining duties of the nonbreaching party, and once there has been a repudiation that party is no longer required to hold himself ready, willing and able to perform." *McKenna* v. *Woods*, 21 Conn. App. 528, 534, 574 A.2d 836 (1990); see also 2 E. Farnsworth, supra, § 8.20, p. 553. In construction cases, we have stated that "the failure to make progress payments is a breach of contract so substantial as to render the contract nugatory. . . . The failure to make installment payments when due goes to the essence of a contract. . . . A failure to make any payments for work in progress goes to the root of the bargain of the parties and defeats the object of the parties in making the agreement." (Citations omitted.) *Silliman Co.* v. *S. Ippolito & Sons, Inc.*, 1 Conn. App. 72, 75–76, 467 A.2d 1249 (1983), cert. denied, 192 Conn. 801, 470 A.2d 1218 (1984). Accordingly, in the face of a property owner's repudiation or material breach of a construction contract, the contractor properly may exercise its right to seek contract damages, including lost profits, even if it has not substantially completed its own performance under the contract. See 13 Am. Jur. 2d 107, Building and Construction Contracts § 112 (2009).

"It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed. . . . The injured party, however, is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain. . . . Guarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach. . . . The concept of actual loss accounts for the possibility that the breach itself may result in a saving of some cost that the injured party would have incurred if he had had to perform. . . . In such circumstances, the amount of the cost saved will be credited in favor of the wrongdoer . . . that is, subtracted from the loss . . . caused by the breach in calculating [the injured party's] damages." (Citations omitted; internal quotation marks omitted.) *Argentinis* v. *Gould*, supra, 219 Conn. 157–58.

"The plaintiff has the burden of proving the extent of the damages suffered. . . . Although the plaintiff need not provide such proof with [m]athematical exactitude . . . the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 224, 990 A.2d 326 (2010). With the foregoing principles in mind, we turn to the specific claims of the parties.

A

The plaintiff first claims that the court improperly concluded that the parties' contract had been terminated for convenience. The plaintiff argues that, as a result, the court limited the plaintiff's recovery to the actual value of time and materials provided for unpaid work completed prior to the purported termination rather than permitting the plaintiff to recover any expectation damages for breach of contract, which would have been calculated using the prices negotiated by the parties and would have included recovery of lost profits for work that the plaintiff was prevented from completing because of the defendant's breach. In response, the defendant argues that the court never found a termination for convenience as claimed by the plaintiff, but rather that it found a "de facto" termination of the contract that was the result of a breakdown in the parties' relationship, for which the court found each party bore responsibility. The defendant also argues that because the court found that the plaintiff had failed to substantially complete its performance under the contract, the plaintiff was not entitled to an expectation measure of damages.

Having carefully reviewed the court's memorandum of decision, we agree with the plaintiff that the court's decision can only be construed as having concluded that the defendant "de facto" terminated the contract for convenience. By resolving the matter as it did, the court failed to reach the legal conclusion that was inevitable based on the court's subordinate findings, namely, that the defendant's actions constituted a material breach or an anticipatory repudiation of the parties' construction contract. We also agree with the plaintiff that in calculating the amount that the plaintiff was owed by the defendant for the work it had completed prior to the purported termination, the court purported to use the measure of damages set forth in the termination for convenience clause of the contract rather than awarding damages based on breach of contract principles. Nevertheless, as we will explain in more detail, our review of the court's detailed calculations reveals that, in large part, those calculations would not have differed materially had the court applied an expectation measure of damages because most of the work on the project had been completed and, where applicable, the court used the lump sum prices negotiated by the plaintiff. Accordingly, although a new hearing in damages is, to some degree, necessary, any such hearing will be significantly limited in scope.

Whether the contract was terminated presents a question of fact that we review under our clearly erroneous standard of review. We begin our discussion with an examination of the court's decision. The court chose to address the first three counts of the complaint collectively, presumably because each was grounded on common allegations that the defendant had failed fully to

compensate the plaintiff for work it had completed on the project. The court further divided its discussion into two broad categories based on the relief sought by the plaintiff: payment of the remaining balance of the $400,000 original contract price and payment for extra work that the plaintiff completed above and beyond what it had agreed to perform under the original contract.

With respect to the work the plaintiff had agreed to perform under the original contract, the court explained that, by the time the plaintiff had stopped working on the construction project in mid-November, 2009, it had completed most of the work, for which it had received $357,500 in payments. The plaintiff had not, however, completed the screening and installation of the purportedly existent gravel bank for which work it was to have received an additional $35,000, or approximately one half of the general cleanup work and final inspection for which the plaintiff was to have received an additional $15,000. The plaintiff claimed that it was entitled to receive the balance of the contract price or $42,500 from the defendant because the defendant had breached the contract by failing to make timely progress payments on extra work and, ultimately, by replacing it with its subcontractor, Massey Brothers. The defendant took the position that the plaintiff had failed to substantially perform the work under the original contract and that, not only was the plaintiff not entitled to any additional payment, but, in fact, the defendant had overpaid the plaintiff and was entitled to a partial reimbursement of the $357,500.

According to the court, whether the plaintiff was entitled to recover any of the remaining $42,500 under the original contract depended on the answers to three inquiries: first, whether the original contract was enforceable, which the defendant challenged at trial; second, if it was enforceable, whether the work required under the contract had been substantially completed by the time the plaintiff stopped working on the project in November, 2009; and third, if such work was not substantially completed, whether the defendant nevertheless was responsible for the noncompletion "by not paying the plaintiff for its extra work and/or by making separate arrangements with the plaintiff's subcontractors and others to complete the [p]roject without the plaintiff's further participation." The court's inquiries are consistent with determining whether the plaintiff had satisfied its burden of proof with respect to elements necessary to sustain an action for breach of contract. See *Chiulli* v. *Zola*, supra, 97 Conn. App. 706–707.

The court rejected the defendant's argument that the material terms in the original contract pertaining to the scope of the work to be completed by the plaintiff were too indefinite and uncertain to be enforceable as a " 'meeting of the minds' . . . ." As a result, the court

found that the contract was enforceable. That determination is not directly challenged by the defendant in its cross appeal.

Having found that there was an enforceable contract, the court next turned to whether the plaintiff substantially had completed its own performance under the original contract, and, thus, was entitled to the defendant's return performance, i.e., full payment of the $400,000 contract price. The court found that the plaintiff had not substantially completed its performance. Although it determined that the screening and installation of the purported on-site gravel bank could not be considered as unfinished work because such work could not have been performed,[15] the court found that there was substantial additional work required by the original contract that remained undone, including the general cleanup work and the final inspection.[16] On appeal, the plaintiff does not challenge the court's factual finding regarding substantial performance.

The court then turned to whether the plaintiff's failure to substantially perform nevertheless "was attributable to the fault of the defendant," either by the defendant having failed to make progress payments for extra work or by it having made arrangements to complete the project without the plaintiff. Although not expressly characterized as such by the court, we view this third inquiry as encompassing whether the defendant breached the agreement, thereby excusing any lack of substantial performance on the part of the plaintiff and permitting it to recover damages based on the contract price. It is at this stage in the court's analysis that the court turned to the issue of contract termination.

Rather than focusing squarely on the legal question of whether the plaintiff had presented sufficient evidence to establish a breach of contract on the part of the defendant, the court opted to take a decidedly equitable approach to the remainder of its analysis, including speculating about possible motivations and justifications for the actions of the parties.[17] The court also discussed in some detail the role that Saunders played in creating the environment that arguably led to the parties' contractual dispute, finding that Saunders had " 'played' " the parties against each other "without colluding or conspiring with either of them."[18] In suggesting that the defendant's failure timely to pay the plaintiff for extra work largely was the result of Saunders' actions, the court attached no legal significance to the fact that Saunders was hired by the defendant to act as its manager and, thus, its agent, and that the defendant had a duty to oversee the actions of its agent or risk being held accountable for the results of those actions.

The court eventually reached the conclusion that both the plaintiff and the defendant *"bore significant responsibility for the breakdown in the parties' rela-*

*tionship, which effectively terminated their contract.* In sum, although neither party was completely at fault for the *de facto* termination of the contract and its consequences, due in major part to the connivance of [Saunders]—the one person who plainly saw this train wreck coming—neither was completely blameless, either, by virtue of its own intransigent, self-serving conduct." (Emphasis added.) This language seems to support the defendant's view of the court's decision, namely, that the parties mutually had walked away from their agreement.

The court, however, continued: "In the final analysis, the court believes it appropriate for the defendant to compensate the plaintiff for all of the work it actually performed under the original contract, plus its reasonable profits thereon, because that is the measure of compensation to which the plaintiff would have been entitled under the contract had the defendant *formally* terminated the contract without cause, under paragraph [eight] thereof. Although the plaintiff did not complete all of the work required of it under the original contract, it cannot reasonably be found to have abandoned the work. The court finds instead that the reason for its noncompletion of such work was the defendant's decision to terminate its involvement in the project. That termination, though understandable and to some degree justifiable in light of the unexpectedly large size of the plaintiff's all-or-nothing demand for payment on the eve of the closure of the asphalt plants for the winter, was not a termination for cause, under paragraph [nine] of the contract, because it was not preceded by proper notice of deficiency and opportunity to cure, as required by the contract. Instead, it was a *de facto* termination without cause, which, although permitted, with proper notice, under paragraph [eight] of the contract, had the consequence of requiring that the plaintiff be paid for all work it had performed to the point of termination plus costs and reasonable profits based upon the performance of such work. The defendant cannot reasonably excuse itself from its obligation to make payment for work done and profits earned under the contract prior to termination based upon its own failure to give proper notice of termination under the contract. *Because the defendant did effectively terminate the contract without cause, without engaging in any of the formal procedures called for by the contract to effect a termination for cause,* the plaintiff is entitled to compensation for its work in an amount representing the fair value of that work in relation to all work required of it under the contract." (Emphasis added.)

It is not entirely clear why the court incorporated the concept of a de facto or effective termination of the contract into its analysis. As previously noted, termination of the contract, de facto or otherwise, was not raised as an issue in either of the parties' posttrial briefs. Further, the court cited no case law or treatise that

authorized a court in a breach of contract action to balance the equities involved in some manner and to find a "de facto" termination of the contract rather than address whether a material breach had occurred as alleged in the complaint before it. We can find no other examples in Connecticut case law of a court finding that a "de facto" termination of a contract had occurred.

Although it is generally accepted that contracting parties may reserve the right to terminate a contract for convenience or cause upon a specified period of notice; 13 J. Perillo, Corbin on Contracts (Rev. Ed. 2003) § 68.9 (3), p. 258; "[i]f a party who has a power of termination by notice fails to give the notice in the form and at the time required by the agreement, it is ineffective as a termination." Id., pp. 258–59. "One who deviates from the terms and the circumstances specified in the agreement for giving notice . . . may be regarded as having repudiated the contract, with all the effects of repudiation including giving the injured party a right to damages . . . ." Id., pp. 260–61; see also D. Rosengren, 13 Connecticut Practice Series: Construction Law (2005) § 1:19, p. 27 (failure to follow notice provision of termination clause invalidates termination and amounts to material breach of contract).

The contract at issue in the present case contained two clauses by which the defendant, through its construction manager, reserved a right to terminate the parties' contract upon a specified period of notice. Section eight of the contract, titled "termination for convenience," provides that the construction manager may terminate the contract at any time and without cause "on not less than five (5) days notice to the [plaintiff]." Section eight further provides that if the contract is terminated for convenience, "[the plaintiff] shall have the right to recover . . . payment for all [w]ork performed to the date of termination and costs incurred and reasonable profits sustained on that portion of the [w]ork performed prior to termination." Section nine of the contract, titled "termination for cause," similarly provides the construction manager with the right to terminate the contract, but only on the basis of a default by the plaintiff in its performance and only if the plaintiff was given notice and five days to correct any default.

The court expressly found that the defendant had failed to give the required notice to effectuate either a termination for cause or a termination for convenience as those terms were understood pursuant to the contract, and the defendant does not challenge those findings. The court also expressly found that the plaintiff had not abandoned its duty to perform but was prevented from completing its performance because of the defendant's decision to end the plaintiff's involvement in the project prior to its completion. Although the court stopped short of addressing whether the defendant's failure to follow the notice provision necessary to effec-

tuate a termination in accordance with the contract amounted to a material breach of the contract, we conclude that such a conclusion necessarily follows from the court's other findings. To hold otherwise would excuse the defendant's nonperformance of a contractual obligation, and would create a new and different agreement, which courts cannot do. See *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 374, 321 A.2d 444 (1973) (in construing contract, court cannot disregard words used by parties or revise, add to, or create new agreement). The approach taken by the court in this matter neglects the court's duty to enforce, rather than unmake, the bargains of the parties. See *Schwartz* v. *Family Dental Group, P.C.*, supra, 106 Conn. App. 773. We agree with the plaintiff that the court's conclusion that there was a de facto termination of the contract was improper and cannot stand. We do not agree with the plaintiff, however, that a new trial is warranted under the circumstances of this case.

A new trial is not necessary because it is inherent in the court's subordinate findings that there was a breach of contract by the defendant. We recognize that the court never made any express finding as to whether the defendant breached the contract, although the court did award damages in favor of the plaintiff on count one of its complaint. We often have stated that whether a contract has been breached is a question of fact; see, e.g., *Seligson* v. *Brower*, 109 Conn. App. 749, 753, 952 A.2d 1274 (2008); and that this court lacks the authority to make findings of facts or draw conclusions from primary facts found. See *Hartford* v. *McKeever*, 139 Conn. App. 277, 283 n.7, 55 A.3d 787 (2012), aff'd, 314 Conn. 255, 101 A.3d 229 (2014). Factual conclusions may be drawn on appeal, however, if "the subordinate facts found [by the trial court] make such a conclusion inevitable as a matter of law . . . or [if] the undisputed facts [as they appear] in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Citations omitted; internal quotation marks omitted.) *State* v. *Reagan*, 209 Conn. 1, 8–9, 546 A.2d 839 (1988).

Here, a finding of a breach of contract inevitably follows from the court's findings that the defendant's actions amounted to a "de facto" termination without cause of the plaintiff's involvement in the project but that the defendant failed to give the plaintiff proper notice under the contract's termination for convenience clause. As previously stated, a party's failure to comply with the notice provision in a termination clause invalidates any attempted termination and amounts to a material breach of the contract. See 13 D. Rosengren, supra, § 1:19, p. 27. The court found that there was a valid contract and that, although the plaintiff failed to substantially complete its performance, "the reason for its noncompletion of such work was the defendant's decision to terminate its involvement in the project."

On the basis of the record before us, we conclude that a remand for a new trial on the merits of the breach of contract count is unnecessary as all elements of a cause of action for breach of contract have been proven.

Although a new trial on the merits is unnecessary, a new hearing in damages, limited in scope, is required. With respect to the work governed by the original contract, the court determined that the plaintiff was entitled to compensation by the defendant "for all of the work it actually performed under the original contract, plus its reasonable profits thereon, because that is the measure of compensation to which the plaintiff would have been entitled under the contract had the defendant formally terminated the contract without cause . . . ." The court found that the $357,500 that the plaintiff already had received for work it completed under the original contract was "a fair approximation of the fair value it is entitled to receive for the performance of such work." The court concluded, therefore, that the plaintiff was not entitled to any further payments from the defendant and that the defendant was "entitled to no credit against any sums ultimately awarded to the plaintiff in this case on the ground of overpayment."

Because we have concluded as a matter of law that the defendant breached the parties' contract rather than terminated it for convenience, we necessarily also conclude that the court should have awarded expectation damages to the plaintiff. In other words, the court should have sought to place the plaintiff in the same position it would have been in had it been able to complete its performance. If the plaintiff had performed all the work it had agreed to perform under the terms of the original contract, it would have been entitled to collect payment of the full $400,000 contract price.[19] Accordingly, in determining whether the plaintiff was entitled to more than the $357,500 that the defendant already had paid for work the plaintiff performed under the original contract, the court should have started with the contract price and then subtracted from it any costs the plaintiff saved by not having to complete its performance. *Argentinis* v. *Gould*, supra, 219 Conn. 157–58. If the difference was more than $357,500, the plaintiff was entitled to additional compensation. If not, then the plaintiff was fully compensated and cannot establish any additional actual loss resulting from the breach.[20] Because we cannot ascertain on the basis of the record before us what costs the plaintiff would have incurred if it had completed all work required of it under the original contract and, thus, cannot calculate the savings resulting from the breach, that issue must be determined at a new hearing in damages.[21]

Our determination that the defendant breached the parties' contract and that the plaintiff therefore was entitled to recover expectation damages applies with equal effect to payment for any of the extra work that

the plaintiff performed pursuant to a validly executed change order because those change orders amended the original contract terms. Accordingly, in order to ensure that the plaintiff received the benefit of its bargain for any unpaid work covered by a change order, the court, in calculating what the plaintiff was owed by the defendant, was required to utilize the lump sum or per unit price indicated on the change order, if one existed. If there was no negotiated lump sum or per unit price associate with a written change order, then, in accordance with the terms of section five of the contract, the price the plaintiff reasonably would have expected to receive would have been the equivalent of the actual cost expended plus a 20 percent fee representing the plaintiff's overhead and profits. To the extent that the court determined that the plaintiff had performed extra work or provided materials that were not directly covered by either the original contract or a valid written change order, such work fell outside the scope of the parties' contractual agreement with respect to the project, and, therefore, the plaintiff only was entitled to reimbursement for its performance on a theory of unjust enrichment for an amount equal to the benefit it conferred on the defendant. See *United Coastal Industries, Inc.* v. *Clearheart Construction Co.*, 71 Conn. App. 506, 515, 802 A.2d 901 (2002).

Our review of the extensive findings and detailed calculations made by the court reveals that the court consistently and properly valued the work and materials provided by the plaintiff by using, whenever applicable, the price negotiated by the parties. In those instances in which the court found that work or materials provided by the plaintiff did not fall within the scope of a written change order, the court calculated the reasonable value conferred on the defendant and awarded such sums to the plaintiff pursuant to the unjust enrichment count. With the exception of the paving work governed by the sixth change order, which we will address in the following subsection, the plaintiff has failed to raise specific challenges to the court's calculations or findings regarding extra work and has not otherwise demonstrated that the court's calculations should be revisited on remand.

In sum, we agree with the plaintiff that the court improperly concluded that the defendant terminated the contract for convenience and incorrectly applied the liquidated damages provision contained in the contract's termination for convenience clause. A new hearing in damages is necessary with respect to the work completed pursuant to the original contract limited to whether the plaintiff is entitled to any portion of the original contract price not paid by the defendant.

### B

We next turn to the plaintiff's claim that the court miscalculated the damages it was entitled to collect

pursuant to the sixth written change order, which governed paving work necessary to finish the upper and lower lots. For the following reasons, we agree that the court miscalculated both what was owed to the plaintiff and the setoff due to the defendant for overpayment.

"[W]e review [a] trial court's damages award under the clearly erroneous standard, under which we overturn a finding of fact when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 225. As we have already stated, "[i]n an action for breach of contract, the general rule is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that he would have been in had the contract been performed." (Internal quotation marks omitted.) *Schlicher* v. *Schwartz*, supra, 58 Conn. App. 88.

Pursuant to the sixth change order, the defendant agreed to pay the plaintiff a total of $189,000 to do paving and other related work on the upper and lower lots. The plaintiff was to be paid in three installments: an initial $80,000 deposit, $70,000 when the upper lot was completed, and $39,000 upon completion of the lower lot. By the time it stopped working on the project, the plaintiff had completed all paving work on the upper lot and had received the first two installment payments totaling $150,000. Although the plaintiff initially claimed a right to recover the remaining $39,000 balance due, it changed its position at trial, no longer seeking any additional payments under the sixth change order, but arguing that it was entitled to retain all of the $150,000 it already had received. The defendant took the position that it had done nothing to prevent the plaintiff from performing all the work required under the sixth change order, and, accordingly, the plaintiff was entitled to recover for its work on the upper lot only an amount equal to the value conferred on the defendant on a theory of unjust enrichment, which the defendant suggested was $86,103, the amount the plaintiff had paid to its paving subcontractor to complete the work on the upper lot. Thus, according to the defendant, it had overpaid the plaintiff and was entitled to a reimbursement of $63,897. The court ordered a reimbursement, but not in the amount sought by the defendant.

The court first reiterated its finding that the defendant was responsible for the plaintiff's failure to complete the paving work by "de facto" terminating the plaintiff's involvement in the project for convenience, albeit without providing proper notice of the termination as provided for in the parties' contract. Consistent with its previous analysis, the court reasoned that the plaintiff

was entitled to be paid for all work it had completed up to the point of termination, including costs and reasonable profits. In calculating that amount, the court first found that the $189,000 price that the parties had agreed to in the sixth change order was controlling as to the total value of all the paving work, but that the $150,000 that the plaintiff had received upon finishing the upper lot did not fairly reflect the value of the paving work actually completed. The court found on the basis of its review of the paving subcontractor's contemporaneous billing to the plaintiff that the subcontractor would have charged the plaintiff $135,000 to complete both lots. The $86,103 that the subcontractor charged the plaintiff for completing only the upper lot thus represented 63.78 percent of the total work. The court concluded that 63.78 percent of $189,000, or $120,544.20, equaled the amount that the plaintiff was entitled receive for the paving work on the upper lot. Because the plaintiff had received $150,000 from the defendant, the court agreed with the defendant that the plaintiff was overpaid but only by $29,455.80, and it ordered a setoff in that amount against the plaintiff's total damage award.

As set forth in the preceding subsection, the court should have concluded that the defendant breached the parties' contract by terminating the plaintiff's involvement in the construction project without proper notice and hiring Massey Brothers to oversee the remainder of all unfinished work on the project, including the remainder of the paving work needed to complete the lower lot. The court's decision to use the measure of damages contained in the contract's termination for convenience clause was improper. Because the defendant breached the contract, the plaintiff was entitled to receive an amount of damages sufficient to place it in the same position it would have been in if it had completed all of the paving work under the sixth change order. See *Schlicher* v. *Schwartz*, supra, 58 Conn. App. 88.

If the plaintiff had been able to complete the work on the lower lot it would have received payments totaling $189,000; however, it is necessary also to credit in favor of the defendant any amount the plaintiff saved by not having to complete the paving work for the lower lot. See *Argentinis* v. *Gould*, supra, 219 Conn. 158. According to the figures found by the court, the plaintiff would have paid its paving subcontractor a total of $135,000, or an additional $48,897 to finish the lower lot. Therefore, $48,897 represents a fair and reasonable estimate of the plaintiff's savings. Accordingly, the plaintiff was entitled to receive $189,000 less $48,897 or $140,103 in order to achieve the full benefit of its bargain with respect to the sixth change order. The plaintiff received $150,000 from the defendant for its work; accordingly, there appears to be no additional compensatory damages as a result of the defendant's

breach. The defendant, on the other hand, only overpaid the plaintiff by $9897, not $29,455.80 as calculated by the court. The defendant's total setoff therefore must be reduced by $19,558.80.

C

The plaintiff next claims that the court improperly failed to hold the defendant bound by Saunders' oral approval of certain overtime payments for labor and equipment that were not included as part of a written change order. The plaintiff acknowledges that the contract expressly provides that, to be effective, any and all changes to the parties' agreement needed to be reduced to writing. Nevertheless, the plaintiff argues that because Saunders was the defendant's agent, he waived any such requirement "due to the circumstances." We decline to review this claim because it is not adequately briefed.

"[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 406, 1 A.3d 1238, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010).

Here, after quoting excerpts from Saunders' trial testimony without placing the quoted material into context or explaining the significance of the language quoted, the plaintiff asserts that the court should have found that the defendant was bound by charges that Saunders orally agreed to pay and that Saunders had waived any requirement that changes to the parties' contractual agreement be in writing. In support of its waiver assertion, the plaintiff cites to *Wexler Construction Co.* v. *Housing Authority*, 144 Conn. 187, 128 A.2d 540 (1956), including a parenthetical quotation indicating that contract provisions requiring written change orders can be waived by the parties so that an owner becomes liable for extra work done by oral direction. The plaintiff's discussion ends there; it does not analyze the asserted legal principle further or explain the relationship between the facts asserted and the law cited. It does not discuss, for example, under what circumstances courts will find a waiver and whether such circum-

stances were present here. Because the plaintiff makes mere conclusory assertions in its main brief regarding this claim rather than providing us with legal analysis, we deem the claim abandoned.

### D

The plaintiff next claims that the court made an erroneous factual finding that the plaintiff's attorney had issued an " 'ultimatum' " to the defendant that the plaintiff would not return to work on the project unless all outstanding invoices were paid. The plaintiff argues that this allegedly erroneous finding "formed the basis for much of the invective the trial court held against [it] throughout the remainder of the decision" and that the "error was so prejudicial to the other findings of the trial court that a new trial is required." The defendant argues that there is no merit to the plaintiff's claim because the plaintiff admitted that fact throughout the proceedings. We find the defendant's argument persuasive.

"If the factual basis of the court's decision is challenged, our review includes determining whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Baron* v. *Culver & Associates, LLC*, 106 Conn. App. 600, 601–602, 942 A.2d 552 (2008).

In its memorandum of decision, the trial court included as part of its statement of facts that the plaintiff's attorney, Lawrence G. Rosenthal, had telephoned Hoffman on behalf of his client to complain about the defendant's failure to pay the plaintiff for completed work, and "to inform him that all ongoing work on the project had been suspended and would remain suspended until such payments were made in full." Later, in rejecting the plaintiff's claim of tortious interference, the court described this interaction as the plaintiff issuing an "ultimatum" that left "the defendant a stark choice: pay what we demand or our work for you is over."

The plaintiff argues that Hoffman was the only witness who testified at trial about the telephone conversation between himself and Rosenthal, and that Hoffmann testified only that he was contacted on the telephone by Rosenthal about the existence of outstanding bills from the plaintiff to the defendant. Hoffman never testified that Rosenthal had informed him that the plaintiff would not return to work until all outstanding bills were paid. Accordingly, the plaintiff argues, the court's

factual finding of an "ultimatum" was clearly erroneous because it was not supported by any evidence adduced at trial.

The defendant does not challenge the plaintiff's assertions with respect to the evidence presented at trial. Instead, the defendant argues that the plaintiff's claim lacks merit because the plaintiff "admitted this fact throughout the proceedings in this case." In support of its argument, the defendant cites to the following statements that the plaintiff made in pleadings that are part of the record as a whole. First, and most significant, in the plaintiff's posttrial proposed findings of facts, the plaintiff stated in relevant part: "Counsel for [the plaintiff] advised Hoffman that until he paid [the plaintiff] for work performed, [the plaintiff] was not returning to the site." Second, in an affidavit that the plaintiff attached to its application for a prejudgment remedy, the plaintiff attested that "on or about November 17, 2009, [the plaintiff] complained to [Hoffman] about the lack of payment and advised him . . . that work would cease on the project for lack of payment." Finally, included in the parties' joint trial management report was the statement that "[the plaintiff] refused to complete performance until payments were made."

We agree with the defendant that the plaintiff cannot prevail on its claim that the court made an erroneous factual finding because that finding is supported by the plaintiff's own factual admissions, which are part of the record as a whole. "Judicial admissions are voluntary and knowing concessions of fact by a party or a party's attorney occurring during judicial proceedings. . . . They excuse the other party from the necessity of presenting evidence on the fact admitted and are conclusive on the party making them. . . . Admissions, whether judicial or evidentiary, are concessions of fact, not concessions of law." (Internal quotation marks omitted.) *Brye* v. *State*, 147 Conn. App. 173, 178, 81 A.3d 1198 (2013).

The plaintiff's own proposed findings of fact unequivocally stated that the plaintiff's counsel had advised Hoffman that the plaintiff would not return to the worksite until it was paid for work already performed. The proposed findings of facts submitted to the trial court are akin to judicial admissions and certainly are part of the record as a whole. Hoffman's trial testimony in no way conflicts with the court's factual finding, nor has the plaintiff cited to any other contradictory evidence in the record that would lead us to believe that the court made a mistake in describing the conversation between Hoffman and the plaintiff's counsel. In sum, the plaintiff is estopped from arguing that the court's finding of fact, which was nearly identical to one of the plaintiff's proposed facts, was clearly erroneous.

We next turn to the defendant's claim, raised in its cross appeal, that the court improperly calculated the amount owed to the plaintiff for work it performed pursuant to the third and sixth written change orders. According to the defendant, the plaintiff failed to provide sufficient documentation prior to the approval of the change orders to establish the fair and reasonable value of the lump sum rates, and, therefore, the court should not have used those amounts in its calculations. We are not persuaded.

As previously set forth, section five of the original contract governs how changes to the scope of work to be performed by the plaintiff were to be handled, including how the price to be paid for such work was to be determined. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [if] there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted; internal quotation marks omitted.) *Levine* v. *Massey*, 232 Conn. 272, 277–78, 654 A.2d 737 (1995). To the extent that the defendant's claim requires us to review the court's interpretation of the language in section five of the contract, our review is plenary.

Section five provides in relevant part that changes to the scope of the work were to be set forth in writing by the construction manager and that the price to be paid for such work was to be "based on mutual acceptance of a lump sum properly itemized and supported by sufficient data to permit valuation by [the] [c]onstruction [m]anager." If the parties could not agree on such a lump sum price, the plaintiff would "be paid on a time and material cost basis," and "[a] fee of 20 [percent] [would] be added to the costs for [c]ontractor overhead and profit."

We find, in accordance with the trial court, no ambiguity in the language employed in section five. We reject the defendant's suggestion that section five should be construed as mandating that any lump sum amount could not exceed the price of costs and materials plus 20 percent. Rather, like the trial court, we read section five "to permit the construction manager and the [plaintiff] to agree to the performance of extra work under a lump sum change order provided that the work to be performed was properly itemized and supported by sufficient data to permit its valuation by the construction manager. In making his valuation decision, [Saunders], acting for Signature in its capacity as construction manager, had to decide if the detail presented to him by the plaintiff as to the proposed work was sufficient to enable him, in light of his training and experience in the field of construction and his familiarity with prevailing market prices charged for such work, to value the work and agree to a price at which to have it per-

formed. Under the contract, the ultimate decision on that issue belonged only to the construction manager, not to the defendant, as its principal, or anyone else. Hence, the true measure of the sufficiency of the data provided by the contractor to support any price agreed to in a lump sum change order was its sufficiency to the construction manager to set that price." (Emphasis omitted.)

Accordingly, resolution of the defendant's claim thus turns on whether Saunders' valuation decision was supported either by data presented to him, his personal knowledge of the construction business or some combination of both. There is nothing in the record to suggest that Saunders had insufficient information to properly evaluate whether lump sum rates on the change orders were fair and reasonable.

With respect to the third change order, which authorized the plaintiff to obtain materials necessary to build the retaining walls required for the project, the court found that Saunders, acting as construction manager, had agreed to pay the plaintiff at a lump sum rate of $21.50 per square foot.[22] The court made no specific findings as to how the plaintiff and Saunders came to agree on that lump sum price, and the defendant has not cited to any portion of the record showing what data, if any, the plaintiff provided to Saunders. The court nevertheless found that the defendant presented no evidence at trial that the lump sum price differed significantly from prevailing market rates for retaining walls of the type that were constructed, and the defendant does not challenge that finding on appeal. Accordingly, on the basis of the record before us, there is nothing to support the defendant's assertion that Saunders had either insufficient data or personal knowledge from which to approve the lump sum price on the third change order.

Similarly, with respect to the sixth change order, which authorized the paving work on the two lots for the lump sum price of $189,000, the court found that "the lump sum price established in that change order was not shown to have been excessive as agreed to, because no evidence was presented at trial to establish that that price was so out of line with prevailing market prices for paving that no honest, competent construction manager could have agreed to it." As with the third change order, the defendant has failed to cite to any portion of the record that would support its assertion that Saunders approved the lump sum price for paving work on the basis of insufficient data or a lack of personal knowledge of prevailing market rates. Accordingly, we reject the defendant's claim.

## II

We next turn to the plaintiff's claim that the court improperly failed to hold the defendant liable for tor-

tious interference with the contractual relationships between the plaintiff and its subcontractors. We are not persuaded.

"[Our Supreme Court] has long recognized a cause of action for tortious interference with contract rights. . . . The essential elements of such a claim include . . . the existence of a contractual or beneficial relationship and that the [defendant], knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . The burden is on the plaintiff to plead and prove at least some improper motive or improper means . . . on the part of the [defendant]. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Calco Construction & Development Co.*, 141 Conn. App. 40, 50–51, 60 A.3d 983 (2013).

In the present case, the court concluded that the plaintiff had failed to prove its claim of tortious interference by a fair preponderance of the evidence. The court acknowledged that, immediately after the plaintiff contacted the defendant about its failure to pay for extra work completed on the project, the defendant contacted some of the plaintiff's subcontractors and suppliers to have them complete the remaining work on the project. The court concluded, however, that such actions were not tortious, but rather seemed to be justified under the circumstances, and that they "did not interfere with any ongoing work by Massey Brothers or any other subcontractor under its subcontract with the plaintiff [because] the plaintiff had suspended all work at the site and instructed its subcontractors to do the same." The court also concluded that the plaintiff had failed to show how the defendant's actions had caused the plaintiff any actual harm.

Although the plaintiff advances several arguments on appeal that challenge the court's determination that the defendant's conduct was not tortious, the plaintiff has not addressed in its brief the court's finding that "the defendant's actions caused the plaintiff no actual harm." "[I]t is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss. . . . Thus, it must appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit. . . . Such a determination is a question for the trier of

fact, as is the question of whether the plaintiff has suffered an actual loss." (Citations omitted; internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 97, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007); see also *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 33–34, 761 A.2d 1268 (2000) (proof some damage sustained necessary to support cause of action for tortious interference). Because some actual loss is necessary to support a claim of tortious interference, and the court expressly found that the plaintiff had failed to establish that element in the present case, the plaintiff's failure to challenge that finding on appeal is fatal to its claim.

### III

The plaintiff next claims that the court improperly ruled in favor of the defendant on those counts of its counterclaim sounding in breach of the covenant of good faith and fair dealing, and a violation of CUTPA on the basis of an erroneous determination that the plaintiff had engaged in an abuse of process by filing an excessive mechanic's lien on the defendant's property.[23] According to the plaintiff, the mechanic's lien issue was not properly before the court in the present action, the court adopted an incorrect legal standard in considering whether the filing of the mechanic's lien was an abuse of process, and there was no showing of any ascertainable loss to support a finding of a CUTPA violation. We are not persuaded by the plaintiff's arguments.

The following facts and procedural history are relevant to our resolution of this claim. Between June and November, 2009, the plaintiff provided materials and services used in the defendant's construction project. The plaintiff provided the defendant with copies of invoices for unpaid extra work totaling in excess of $1.3 million, although the plaintiff was aware that this total included intentional overcharges of at least $463,000. The defendant, without first properly terminating its contract with the plaintiff, hired the main subcontractor to finish the project. By December 4, 2009, the defendant had made no further payments toward any of the outstanding balances demanded by the plaintiff, and the plaintiff filed a mechanic's lien on the defendant's property in the amount of $1.4 million. Shortly thereafter, the plaintiff also commenced the present civil action. The plaintiff later filed a separate action to foreclose the mechanic's lien, which was not consolidated with the present action and remains pending before the Superior Court.[24]

The defendant filed a counterclaim in the present action asserting, inter alia, a breach of the implied covenant of good faith and fair dealing, and a violation of CUTPA.[25] In support of each count of the counterclaim, the defendant alleged that the plaintiff had intentionally inflated the amounts it sought to recover from the defen-

dant for unpaid work and that it had filed an excessive mechanic's lien against the defendant's property in order to pressure the defendant into paying the plaintiff's inflated claims. The defendant argued in its post-trial brief in favor of its counterclaim that the plaintiff's action of filing and seeking to enforce a grossly inflated mechanic's lien amounted to an abuse of process.

Although the defendant never filed a counterclaim directly asserting a separate cause of action for abuse of process, which is an intentional tort consisting of separate and distinct elements from causes of actions sounding in breach of the implied covenant of good faith and fair dealing and CUTPA, the court nevertheless concluded that the defendant's allegation regarding the plaintiff's filing of an excessive mechanic's lien, "reduced to its essence, is a claim of abuse of process." In support of what the court described as a "common theory of liability," the court found that, in some instances, the plaintiff intentionally had sought to over-charge the defendant for work performed on the project, that the plaintiff was aware that the amount of the mechanic's lien it placed on the defendant's property was excessive due to those overcharges, and that "the plaintiff's primary purpose for filing that manifestly excessive mechanic's lien was to pressure the defendant into paying more money than it justly owed for the plaintiff's work on the project." As a result of those findings, the court held that the defendant was entitled to recover all costs and fees it reasonably incurred to defend itself against the plaintiff's excessive mechanic's lien, and, with respect to the CUTPA counterclaim, all costs and attorney's fees the defendant reasonably incurred to prosecute the abuse of process aspect of that claim. After later conducting a hearing in damages, the court awarded the defendant $40,590.64 in damages on both claims, and, as to the CUTPA claim only, awarded attorney's fees pursuant to General Statutes § 42-110g (d) of $78,653.52, for a total award of $119,244.16.

Before turning to the arguments advanced by the plaintiff in support of its claim that the court improperly found in favor of the defendant on its counterclaim on the basis of a finding of abuse of process regarding the mechanic's lien, we set forth some relevant legal principles. "An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed. . . . Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, empha-sizes that the gravamen of the action for abuse of pro-cess is the use of a legal process . . . against another primarily to accomplish a purpose for which it is not designed . . . . Comment b to § 682 explains that the addition of primarily is meant to exclude liability when

the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 772–73, 802 A.2d 44 (2002). Thus, an abuse of process requires the plaintiff to show: "(1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used the proceedings primarily to obtain a wrongful purpose for which the proceedings were not designed." 1 D. Pope, Connecticut Actions and Remedies, Tort Law (1993) § 8:02. It follows, therefore, that to determine whether a plaintiff abused the mechanic's lien process, it is necessary to consider the purpose underlying our mechanic's lien statutes, General Statutes §§ 49-33 through 49-40a.

"In this state, a mechanic's lien is a creature of statute and gives a right of action which did not exist at common law. . . . The purpose of the mechanic's lien is to give one who furnishes materials or services the security of the building and land for the payment of his claim by making such claim a lien thereon . . . . Moreover, [t]he guidelines for interpreting mechanic's lien legislation are . . . well established. Although the mechanic's lien statute creates a statutory right in derogation of the common law . . . its provisions should be liberally construed in order to implement its remedial purpose of furnishing security for one who provides services or materials." (Internal quotation marks omitted.) *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 183–84, 942 A.2d 1028 (2008). Once a mechanic's lien is perfected, the lienor has one year in which to file an action to foreclose that lien or the lien is automatically extinguished. See General Statutes § 49-40a.

The legislature also has provided procedural safeguards by which a property owner can seek to have a mechanic's lien discharged or reduced as to the amount of the lien. If no action to foreclose a lien has been filed, General Statutes § 49-35a (a) authorizes a property owner to file an application with the Superior Court asking for discharge or reduction of the lien. After the application is filed, the court will set a hearing date and notice will issue to the lienor. At the hearing, the property owner will have an opportunity to prove by clear and convincing evidence that the amount of the lien claimed is excessive and that it should be reduced. After an action to foreclose a lien has been filed, the property owner "may at any time prior to trial, unless an application under subsection (a) of this section has previously been ruled upon, move that the lien be discharged or reduced." General Statutes § 49-35a (c).

In addition to procedures to have a lien discharged or reduced in amount, our statutes also permit an owner whose property is subject to a lien to have the lien

dissolved by substituting a surety bond. See General Statutes § 49-37. The purpose of that provision is to allow a property owner to remove the lien from the property's chain of title and yet continue to ensure that funds exist to satisfy a lienor's claim should he or she later obtain judgment against the property owner.

In the present case, the court made the following factual findings in support of its conclusion that the plaintiff's filing of the $1.4 million mechanic's lien against the defendant's property amounted to an abuse of process. The court found that the plaintiff had instituted legal process against the defendant, namely, a mechanic's lien attached to the defendant's property; that that mechanic's lien was "manifestly excessive" and that the plaintiff knew that the amount of the mechanic's lien was excessive because it included some $463,000 in intentional overcharges for work the plaintiff had performed; and that "the plaintiff's *primary purpose* for filing that manifestly excessive mechanic's lien was to pressure the defendant into paying more money than it justly owed for the plaintiff's work on the project." (Emphasis added.)

Importantly, on appeal, the plaintiff has not challenged any of these factual findings as being clearly erroneous. The plaintiff also has not argued that the court's determination that it had engaged in an abuse of process was in some manner insufficient to support liability either under a theory of breach of the implied covenant of good faith and fair dealing or a CUTPA violation. Rather, the primary arguments advanced by the plaintiff are that the remedial purpose of the mechanic's lien statutes is to provide contractors with security for materials and services provided, and that the overstating of the amount of the lien cannot, in and of itself, support a finding of an abuse of process. The plaintiff also contends that, to the extent that the defendant believed that the mechanic's lien was manifestly excessive, the defendant, rather than pursuing an abuse of process claim, should have utilized the procedural safeguards contained in the mechanic's lien statutes by filing an application to reduce the amount of the lien or, after the foreclosure action was filed, by filing a motion in that action asking for a reduction in the lien.[26] Under the circumstances of this case, and in light of the unchallenged factual findings of the trial court, we are not persuaded by the plaintiff's arguments.

The plaintiff first suggests that the court, by subjecting it to liability in the present case, created an unworkable new standard that would require any person filing a mechanic's lien to know with certainty that the amount stated on the lien at the time of the filing will be the same or very close to the actual amount due and owing as later determined by a court or else risk a claim of abuse of process. According to the plaintiff, such a requirement would be in contravention of the

rule that the mechanic's lien statutes should be liberally construed in favor of furnishing security to parties who provide services or materials. In support of its argument, the plaintiff notes that the contractor in *Anthony Julian Railroad Construction Co.* v. *Mary Ellen Drive Associates*, 39 Conn. App. 544, 546, 664 A.2d 1177, cert. denied, 235 Conn. 930, 667 A.2d 800 (1995), alleged a lien of $400,164, but that the court ultimately found that it was only due $315,164 for the work performed prior to the filing of the lien, and that there was no discussion of an abuse of process that was based on an excessive lien. The plaintiff also cites to a pair of vintage Supreme Court cases for the proposition that overstating the amount of a lien is insufficient to invalidate the lien provided that charges "were made under a fair claim of right, in good faith, and under the belief that they were justified under the terms of the contract." *Soule* v. *Borelli*, 80 Conn. 392, 399, 68 A. 979 (1908); see also *Kiel* v. *Carll*, 51 Conn. 440, 441 (1883).

The cases cited by the plaintiff are readily distinguishable from the factual underpinnings of the present case, and do not support the policy argument advanced by the plaintiff. The court in the present case did not find that the plaintiff committed an abuse of process simply because it had filed a mechanic's lien that was in excess of what it ultimately determined the plaintiff was in fact due and owing. Here, the court found that the plaintiff knowingly and intentionally filed a manifestly excessive lien, primarily for an improper purpose. This is not a case in which a party, in good faith and with a belief it was justified, filed a mechanic's lien for an amount that ultimately was determined by a court to be more than what legally was recoverable. We are unconvinced that the court applied an incorrect standard or that our affirmance of it will open the floodgates to litigation or have a chilling effect on parties seeking to exercise their rights under the mechanic's lien statute.

The second argument advanced by the plaintiff is that if the mechanic's lien was manifestly excessive, the defendant should have utilized the procedural safeguards contained in the mechanic's lien statutes by filing an application to reduce the amount of the lien or, after the foreclosure action was filed, by filing a motion for a reduction in the lien in that action. The plaintiff has not engaged in any statutory analysis of the mechanic's lien statutes, however, nor has it directed us to any particular statute or statutory language suggesting that the legislature intended that the procedural remedies and protections provided for in the mechanic's lien statutes be the sole and exclusive remedy, or intended to preclude a property owner from pursuing other remedies outside an action to foreclose the mechanic's lien. Accordingly, while such an argument might be advanced in some future action, we decline to address it in the present case.

The plaintiff's only remaining arguments relate to its challenge to the court's finding that the defendant had suffered "an ascertainable loss of money to defend itself against the excessive mechanic's lien." According to the plaintiff, the defendant did not incur any costs in defending against the mechanic's lien, because, to the extent that the defendant incurred any costs, they were paid by a separate corporate entity, and there was no agreement requiring the defendant to reimburse the entity. The defendant argues that the same arguments were made to and considered by the court, and that the court properly rejected them. We agree with the defendant.

"To prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; General Statutes § 42-110b (a); and (2) each class member claiming entitlement to relief under CUTPA has suffered an ascertainable loss of money or property . . . . The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief. . . . Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation." (Citation omitted; internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 217–18, 947 A.2d 320 (2008).

For purposes of satisfying the ascertainable loss requirement of CUTPA, our Supreme Court has defined an "ascertainable loss" as "a loss that is capable of being discovered, observed or established. . . . The term loss necessarily encompasses a broader meaning than the term damage, and has been held synonymous with deprivation, detriment and injury. . . . To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." (Citations omitted; internal quotation marks omitted.) Id., 218.

Whether the plaintiff's actions resulted in an ascertainable loss is "a question of fact, which we review under the clearly erroneous standard." *D'Angelo Development & Construction Corp.* v. *Cordovano*, 121 Conn. App. 165, 182, 995 A.2d 79, cert. denied, 297 Conn. 923, 998 A.2d 167 (2010). "It is futile to assign error involving the weight of testimony or the credibility of witnesses. . . . This court can neither retry the facts in order to make our own findings nor pass on the credibility of witnesses . . . but can only review such findings to determine whether they could legally, logically and reasonably be found thereby establishing that the trial court could reasonably conclude as it did." (Citations omitted; internal quotation marks omitted." *Matthews* v. *Nolan*, 26 Conn. App. 920, 920–21, 599 A.2d 747 (1991).

In the present case, the court rejected the same arguments that the plaintiff reasserts on appeal. The court specifically found, on the basis of the testimony of two witnesses presented at the special hearing in damages, that although the defendant had a long-standing arrangement with a business entity operating under the trade name of the Hoffman Auto Group pursuant to which that entity paid the defendant's costs and expenses, and otherwise provides them funds for their operations, the defendant was nevertheless legally responsible for all costs and expenses it reasonably incurred in defending itself against the plaintiff's excessive mechanic's lien, because the defendant had a duty to reimburse the entity for all costs and expenses initially paid on behalf of the defendant. Because the court's finding is based on its assessment of the credibility of witnesses, it is not assailable on appeal. The court's finding that the defendant suffered an ascertainable loss is legally and logically supported by the record. In sum, we reject each of the plaintiff's arguments made in support of its claim and, accordingly, affirm the court's judgment with respect to the defendant's counterclaim.

IV

Finally, we turn to the defendant's claim on cross appeal that the court improperly rejected that portion of its counterclaim for breach of the implied covenant of good faith and fair dealing that sought to recover expenses incurred by the defendant in defending against mechanic's liens filed by some of the plaintiff's subcontractors. We conclude that the court properly rejected that aspect of the defendant's counterclaim.

"[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 16 n.18, 938 A.2d 576 (2008). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004). "Essentially [the duty of good faith and fair dealing] is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably

intended. . . . Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review." (Citations omitted; internal quotation marks omitted.) *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 837, 3 A.3d 992 (2010).

In support of its counterclaim alleging that the plaintiff had breached the implied covenant of good faith and fair dealing, one of the arguments that the defendant asserted was that the plaintiff had failed to pay its subcontractors and suppliers in a timely fashion for their work on the project, which caused them to file unnecessary mechanic's liens against the defendant's property. As a result, the defendant claims to have incurred expenses in defending against the subcontractors' liens. The court rejected the defendant's argument, noting that the defendant had failed to provide, nor had the court itself found, any authority indicating that such allegations could support a claim for breach of the implied covenant of good faith and fair dealing. We agree.

Like the trial court, we reject the defendant's suggestion that the plaintiff's failure to pay its subcontractors and suppliers in a timely fashion somehow breached any duty owed to the defendant under its construction contract with the plaintiff. There was no provision in the contract requiring the plaintiff to make timely payment to any subcontractor it might utilize in fulfilling its contract obligations. Thus, any right of the subcontractors to be paid in a timely fashion was not a right or benefit that inured to the defendant as a result of the contract. We agree with the court's assertion that "accepting the defendant's argument would require an inappropriate extension of the duty owed by one contracting party to the other . . . ." As the court aptly noted, "[i]f the defendant wishes to protect itself in this manner in its future business dealings with general contractors, it can surely negotiate with those contractors for such favorable contract terms." Accordingly, we reject the defendant's claim.

The judgment is reversed only as to the award of damages on count one of the third amended complaint for breach of contract, and the case is remanded for a new hearing in damages at which the court shall determine whether the plaintiff is entitled to any additional compensation for work completed under the original contract, consistent with part I A of this opinion, and shall reduce the defendant's setoff for paving work by $19,558.80. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] In addition to those counts brought against Hoffman Enterprises Limited Partnership, the operative complaint contained an additional count against the defendant Jeffrey S. Hoffman, an officer and a limited partner of Hoffman Enterprises Limited Partnership, sounding in negligent misrepresentation. The court granted a motion to strike the count against Hoffman, and the plaintiff appealed from the judgment rendered on the stricken count. See

Practice Book § 61-3. This court reversed that judgment and remanded the matter for further proceedings on the previously stricken count. See *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 134 Conn. App. 203, 38 A.3d 215 (2012), aff'd, 309 Conn. 342, 71 A.3d 480 (2013). Final action on that count remains pending in the Superior Court. Because the present appeal only pertains to the court's judgment on the remaining counts of the complaint brought by the plaintiff against Hoffman Enterprises Limited Partnership and Hoffman Enterprises Limited Partnership's counterclaim, we will refer to Hoffman Enterprises Limited Partnership throughout this opinion as the defendant.

[2] The defendant also claims in its cross appeal that the trial court failed to award the defendant $8535.12 in "nontaxable" costs in its calculation of the damages that the defendant was entitled to under General Statutes § 42-110g (d) as a result of the plaintiff's CUTPA violation. The defendant acknowledges that the trial court properly determined that it was precluded from awarding such costs because of this court's decision in *Taylor* v. *King*, 121 Conn. App. 105, 133, 994 A.2d 330 (2010), which, in turn, relied upon *Miller* v. *Guimaraes*, 78 Conn. App. 760, 782–83, 849 A.2d 422 (2003). The defendant nevertheless asks us to revisit the decision in *Miller* and its progeny, suggesting that language in a recent opinion by our Supreme Court casts significant doubt on the rationale underlying *Miller*. See *Ulbrich* v. *Groth*, 310 Conn. 375, 462, 78 A.3d 76 (2013) ("we need not decide whether the holding of *Miller* that § 42-110g [d] does not authorize the trial court to award costs that are not authorized by [General Statutes] § 52-260 should be overruled, because we conclude that the award of such costs is authorized by § 42-110g [a]"). It is well established, however, that "[t]his court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc." (Internal quotation marks omitted.) *Hylton* v. *Gunter*, 313 Conn. 472, 488 n.16, 97 A.3d 970 (2014); see also Practice Book § 70-7 (a); *Wells Fargo Bank, N.A.* v. *Tarzia*, 150 Conn. App. 660, 667, 92 A.3d 983 ("[o]ur rules of practice and our own policy do not permit a panel of this court to overturn decisions of this court" [internal quotation marks omitted]), cert. denied, 314 Conn. 905, 99 A.3d 635 (2014). The defendant has not requested en banc consideration by this court. Accordingly, we decline to consider this claim.

[3] "[I]t is a general rule of agency law that the princip[al] in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." (Internal quotation marks omitted.) *Hudson United Bank* v. *Cinnamon Ridge Corp.*, 81 Conn. App. 557, 572–73, 845 A.2d 417 (2004); 1 Restatement (Second), Agency § 140, p. 349 (1958). Thus, "[i]f a contract is made with a known agent acting within the scope of his authority for a disclosed principal, *the contract is that of the principal alone . . . .*" (Emphasis added; internal quotation marks omitted.) *Whitlock's, Inc.* v. *Manley*, 123 Conn. 434, 437, 196 A. 149 (1937).

Here, although the defendant was not a signatory to the contract, the contract contains language from which it can be understood that the construction services the plaintiff agreed to provide were intended to benefit the defendant. The defendant does not dispute that Signature was acting as its properly disclosed agent and within the scope of its authority when it executed the original contract with the plaintiff, nor does the defendant contest that, as the principal, it was bound by the terms of the contract entered into by its disclosed agent, Signature.

[4] Section four of the contract provides:

"PAYMENT—Upon signing of this Agreement, Construction Manager shall pay Contractor the sum of Forty Thousand Dollars [$40,000].

"Within five calendar days of substantial completion of the listed work items, Construction Manager will pay as follows:

"(a) Preparation of swale, drainage trenches, furnishing and installation of silt fences, furnishing and installation of hay bales and silt matting [$75,000]

"(b) Mass excavation and backfill and Pond draining and backfill [$200,000]

"(c) Screening and installation of existing gravel bank and top soil for use on site [$35,000]

"(d) Furnish and installation of drainage pipe and structures [$35,000]

"(e) General clean up and final inspection [$15,000]."

[5] Exhibit A provides:

"1. Changes made by [Signature] to the Plans as revised May 13, 2009 which Contractor agrees to perform as part of this Agreement are as follows:

"Contractor will use existing gravel bank for base under parking lots, and

back fill for piping and structures. If there is insufficient existing gravel, Construction Manager will issue a Change Order to purchase, deliver and install such gravel as needed.

"Contractor will screen the gravel bank on site and use for base instead of process aggregate.

"Construction Manager agrees to leave on site excess materials and Contractor will not truck any excess materials off site. If it becomes necessary, Construction Manager will issue a Change Order to Contractor to remove and dispose of excess material.

"Contractor will screen machine existing top soil on site and will spread screen top soil by machine and use the existing top soil from the site. (Note: [the plaintiff] will not purchase any top soil if need[ed]).

"2. Changes made by Construction Manager to plans [are] as follows:

"(a) Eliminating drainage piping, catch basins, and manholes structures (See drawings C 1.3);

"(b) Raise finish elevation for parking lots and slopes and slopes to a minimum three feet;

"(c) [Substitute] erosion control blanket for rip-rap stone in all locations;

"(d) Furnish and install drainage pipe and structures as follows: 15" HPDE (pipe) 224 LF, 18" HPDE (pipe) 10 LF, 24" HPDE (pipe) 30 LF, 30" RCP (pipe) 140 LF, 4 man hole structures MH1, MH2, MH3, & MH4, catch basin structures 1 EADC (CB) & 2 CL (CB) and 1 each crystal stream model no. 1056;

"(e) Extend jeep trail approximately 350 LF in northwest corner of property (strip top soil and install screen gravel from site into trail and compact)."

[6] Exhibit B provides in relevant part:

"Items removed and/or not included in this Contract:

"(1) Furnish and install retaining walls (as shown on Drawing C 1.3);

"(2) Furnish and install drainage, stone backfill and earth backfill for retaining walls (as shown on Drawing C 1.6);

"(3) Rip & Rap swales, trench drains, slope protection and aprons (as shown on Drawing C 1.3);

"(4) Chain link fencing (as shown on Drawing C 1.3);

"(5) Bituminous Paving ([a]s shown on Drawing C 1.3);

"(6) Bituminous Curbing;

"(7) Wood Railings;

"(8) Landscaping ([a]s shown on Drawing C 1.2);

"(9) Hand raking slope;

"(10) Hydroseeding entire project;

"(11) Wood gate;

"(12) 8 feet and 6 feet wood screen fence;

"(13) Permits;

"(14) Providing survey staking and bench mark elevation;

"(15) Rock excavation;

"(16) Trench excavation."

[7] Section seventeen of the contract also contains an integration clause, which provides that the written contract constitutes the entire agreement between the parties with respect to the construction project. It further provides that the contract could not be "varied by an oral [a]greement or representation or by anything other than an instrument in writing of a subsequent date hereto, executed by both parties by their duly authorized representatives."

[8] On the written change order, adjacent to the amount of the process stone to be provided, Saunders handwrote, "to be verified."

[9] Although exhibit A provided that the plaintiff was to "use existing gravel bank," there was no existing gravel bank on the property, necessitating the location of another source of gravel.

[10] Although the plaintiff presented Saunders with invoices for the additional extra work, those invoices were never signed by Saunders or otherwise accepted by Signature as a mutually acceptable lump sum price for the work indicated and, thus, were not written change orders as contemplated under the contract.

[11] On November 30, 2010, the plaintiff commenced a separate action to foreclose its mechanic's lien, *Coppola Construction Co.* v. *Phyllis W. Hoffman, Trustee*, Superior Court, judicial district of Hartford, Docket No. CV-10-6016911-S. That action remains pending before the Superior Court.

[12] The defendant also sought a setoff on the basis of Massey Brothers' assignment to the defendant of Massey Brothers' claim against the plaintiff for unpaid work totaling $290,000, and for payments not otherwise credited

that the defendant allegedly had made to other subcontractors of the plaintiff.

[13] The present case was consolidated and tried with a related action commenced by the defendant against Signature and Saunders asserting causes of action sounding in breach of contract, intentional and/or negligent misrepresentation, misappropriation of funds and violations of CUTPA. A default judgment was rendered by the court against Signature and Saunders in that matter on May 28, 2010.

[14] "Unjust enrichment and quantum meruit are forms of the equitable remedy of restitution by which a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties." *Burns* v. *Koellmer*, 11 Conn. App. 375, 385, 527 A.2d 1210 (1987). "Quantum meruit is usually a remedy based on implied contract and usually relates to the benefit of work, labor or services received by the party who was unjustly enriched, whereas unjust enrichment relates to a benefit of money or property . . . and applies when no remedy is available based on the contract. . . . The lack of a remedy under a contract is a precondition to recovery based on unjust enrichment or quantum meruit." (Citations omitted.) *United Coastal Industries, Inc.* v. *Clearheart Construction Co.*, 71 Conn. App. 506, 512–13, 802 A.2d 901 (2002).

[15] See footnote 10 of this opinion.

[16] The court found that in addition to the cleanup work and the final inspection, the following additional work, covered by the original contract, remained unfinished: preparation of swales and drainage trenches; the furnishing and installation of silt fences, hay bales and silt matting; the draining and backfilling of the detention pond; and the furnishing and completion of a jeep trail.

[17] An action seeking damages for breach of contract is indisputably legal in nature, i.e., an action at law, not equity. *Northeast Savings, F.A.* v. *Plymouth Commons Realty Corp.*, 229 Conn. 634, 642, 642 A.2d 1194 (1994).

[18] The court explained: "Saunders, for his part, was the proverbial man in the middle. On the one hand, he was desperate to get the job completed, at least to the point of paving both the upper and the lower lots before the construction season ended for the year with the shutting down of the asphalt plants when the weather turned cold in late fall. Keeping the plaintiff satisfied so that it would keep working on the project to the point of completion was a high priority for him, and so he never told [the plaintiff] about [Hoffman]'s intent to get the job done for only $600,000. On the other hand, he was well aware that the costs to build of the project were already running much higher than [Hoffman]'s wholly unrealistic $600,000 limit. Accordingly, he did not submit to the defendant all invoices for extra work he had received from the plaintiff, and he delayed completing his reconciliation of the work slips received from Massey Brothers in order to put off [Hoffman]'s predictably adverse reaction when the project's true costs were made known to him."

[19] The court found that any work that the plaintiff had agreed to perform in the original contract with respect to the existing on-site gravel bank could not have been performed because no such gravel bank ever existed. Because, under the court's resolution of the contractual claims, it was not necessary to consider whether the plaintiff was entitled to recover profits for work under the original contract work that it was prevented from completing due to the defendant's breach, the court never considered to what extent the contract price should be reformed with respect to the existing gravel bank provision, either because of mutual mistake or impossibility of performance. Because we conclude that the court failed to apply a correct measure of damages with respect to unfinished work covered by the original contract and that a new hearing in damages will be necessary, we leave for the court on remand to determine whether in calculating damages the contract price of $400,000 should be reduced to reflect the nonexistence of the gravel bank and, if so, in what amount.

[20] Because the defendant has not challenged on appeal the court's decision with respect to its payment for work completed under the original contract, in particular the court's decision that it was not entitled to a setoff for overpayment, that issue is abandoned and should not be considered by the court on remand.

[21] Although the court found that the defendant had paid Massey Brothers "a total of $50,000 for its completion of unfinished work on the project," which did not include payment for finishing the paving work on the lower lot, it is not entirely clear whether that $50,000 payment is a fair representation of the costs that the plaintiff would have incurred in completing the work left unfinished under the original contract.

[22] The change order provided for construction of retaining walls totaling 13,274 square feet, representing $285,391 in cost of materials. The court determined that the walls actually built totaled 12,564 square feet, for which the court found that the plaintiff should have received the lump sum price of $21.50 per square foot or $270,126. The defendant already had paid the plaintiff installment payments totaling $215,000, and therefore the court awarded the plaintiff an additional $55,126.

[23] The court rejected the defendant's argument that the plaintiff's overcharging for some of the work it performed on the project, whether intentional or otherwise, rose to the level of a breach of the covenant of good faith and fair dealing or a violation of CUTPA.

[24] We note that the plaintiff's mechanic's lien foreclosure action has been consolidated with several actions brought by the plaintiff's former subcontractors to foreclose their own mechanic's liens filed against the defendant's property. On March 8, 2011, a cash bond in the amount of $1.2 million was substituted in lieu of the various mechanic's liens. That bond was later reduced to $300,000 on April 8, 2013, by agreement of the parties.

[25] In total, the defendant filed a four count counterclaim, which the court concluded was "based upon four distinct and different theories of liability, to wit: breach of the implied covenant of good faith and fair dealing, as alleged in count one; fraud, as alleged in count two; aiding and abetting a breach of fiduciary duty, as alleged in count three; and unfair or deceptive trade practices, in violation of CUTPA, as alleged in count four."

[26] The plaintiff also argues that issues pertaining to the mechanic's lien, including costs associated with defending against the mechanic's lien, were not properly before the court in this matter because there was a separate pending action for foreclosure of the mechanic's lien, and that the court's decision was "an erroneous exercise of the court's jurisdiction" and that "[t]here cannot be abuse of a process for defending against a lien that was not part of the plaintiff's complaint and not before the court." The plaintiff, however, provides no real analysis beyond those conclusory statements. See *Paoletta* v. *Anchor Reef Club at Branford, LLC*, supra, 123 Conn. App. 406 (claims on appeal consisting of conclusory statements without legal analysis generally deemed abandoned for lack of adequate briefing).

Even if we were to consider the merits of the plaintiff's argument, however, it nevertheless fails because the mechanic's lien was pleaded, and therefore was before the court for its consideration, in conjunction with the defendant's counterclaim. As a court of general jurisdiction, the trial court had competence to entertain any related tort claim raised by the defendant, including an alleged abuse of process. See *Keller* v. *Beckenstein*, 305 Conn. 523, 538, 46 A.3d 102 (2012) (Superior Court sole court of original jurisdiction for all causes of action). "Once it is determined that a tribunal has authority or competence to decide the class of cases to which the action belongs, the issue of subject matter jurisdiction is resolved in favor of entertaining the action." (Internal quotation marks omitted.) *Amodio* v. *Amodio*, 247 Conn. 724, 728, 724 A.2d 1084 (1999). The only way the court would have lacked subject matter jurisdiction or authority to hear the mechanic's lien/abuse of process allegations in the present case is if the legislature, by statute, had divested the court of its jurisdiction. The plaintiff has cited to nothing in either the mechanic's lien statutes or any other statutory provision supporting its claim.